```
UNITED STATES DISTRICT COURT
   MIDDLE DISTRICT OF TENNESSEE
         NASHVILLE DIVISION
```

| | |
|---|---|
| LOUIS JOSEPH ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:05-0271 |
| ) | Judge Echols |
| JAMES EMMONS, ALLIED VAN ) | |
| LINES, INC., TRANSGUARD ) | |
| INSURANCE COMPANY OF AMERICA, ) | |
| INC. AND J.J. CARTER & SONS ) | |
| OF NASHVILLE, INC., FORMERLY ) | |
| KNOWN AS JOHN CARTER MOVING ) | |
| OF TENNESSEE, INC., D/B/A ) | |
| JOHN CARTER'S WORLDWIDE ) | |
| MOVING, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM

This is a negligence action arising as a result of Plaintiff's fall through a ceiling from the floor of an attic while engaged in moving household items. Pending before the Court is a Motion for Summary Judgment filed by Defendant James Emmons ("Emmons") (Docket Entry No. 57) to which Plaintiff Louis Joseph ("Joseph") has responded in opposition (Docket Entry No. 65). Also pending is the Motion for Summary Judgment filed by Defendants Allied Van Lines, Inc., Transguard Insurance Company of America, Inc., and J.J. Carter and Sons of Nashville, Inc., formerly known as John Carter Moving of Tennessee, Inc., d/b/a John Carter's Worldwide Moving (collectively "Allied Defendants") (Docket Entry No. 53),

1

which has also been responded to by Plaintiff. (Docket Entry No. 71).[1] Finally, Plaintiff has filed a "Motion for Substitution of Party" (Docket Entry No. 62).

## I. FACTUAL BACKGROUND

J.J. Carter acted as the booking or originating agent for Allied Van Lines in relation to a move of Emmons' household goods from Nashville, Tennessee to Watsonville, California. (Pf. SOF ¶¶ 1-2; Emmons Depo. at 13).[2] Sandra Bloomfield, a J.J. Carter representative, toured Emmons' home prior to the move and noted nothing amiss. (Pf. SOF ¶ 16). J.J. Carter representatives packed some of the items in the Emmons' home. (Pf. SOF ¶ 29).

Joseph was the driver for Emmons' move on October 20, 2003. (Defs. SOF ¶ 1). On that date, Joseph worked as an independent contractor and not as an employee of either Allied or J.J. Carter. (Id. ¶ 2).

On the morning of the move, Joseph, accompanied by a couple of helpers (including his nephew), met Emmons at Emmons' home. Joseph went through the house with Emmons to determine what needed to be

---

[1]Defendants have also filed motions requesting a hearing in relation to their Motions for Summary Judgment (Docket Entry Nos. 73, 80). Because a hearing will not materially aid the Court in resolving the Motions for Summary Judgment, those requests will be denied.

[2]Reference to "SOF" (statement of facts) are to those facts which are undisputed by the parties. Supporting citation to the record is provided where a given statement has not been agreed upon by the parties.

moved. At some point after the initial inventory, Emmons (who had never been informed that things from the attic could not be removed by the movers from the room) told Joseph there were some items in the attic which needed to be moved. Those items included boxes, golf club bags, a fan, and miscellaneous other items. (PF. SOF ¶¶ 30-34).

Initially, Joseph protested that he was not allowed to move items from an attic. After calling an Allied dispatcher, Joseph agreed to move the items in the attic because he was told to "go get it" and because he wanted to "ma[k]e peace with everybody and get the stuff out of there." (Joseph Depo. at 105).

Entry to the attic was by way of a standard staircase through a standard doorway. The room was lit well enough for Joseph to see and tall enough for Joseph to stand. (Defs. SOF ¶¶ 7-9).

The attic was partially floored. The first half of the floor was covered with wood, although this covering has been alternatively described as plywood flooring or planking similar to hardwood flooring. The back half of the room (from the edge of the flooring toward the outer wall of the house) was not covered and thus it consisted merely of exposed ceiling joists and insulation. (Def. SOF ¶ 4). The actual floored area was approximately ten feet by twelve feet. (Def. SOF ¶ 27).

The boxes and other household goods to be removed from the room were located up against the wall but on the floored section of

3

the room. (Def. SOF ¶ 5). While attempting to remove one of the last remaining items from the attic, Joseph fell over into the joist/insulation area, leaving his legs hanging down into the kitchen area. (Defs. SOF ¶ 11). Prior to the fall, Joseph moved around in the room without any problems. (Defs. SOF ¶ 12).

Joseph was injured as a result of the fall. After his nephew extricated him from the ceiling, Emmons called the Allied office to tell them the driver had fallen though the ceiling of the attic, whereupon the Allied representative allegedly stated "what is he doing in the attic? He is not supposed to be in the attic." (Pf. SOF ¶ 40).

Whether Joseph merely lost his balance or took a wrong step which caused him to fall, or whether Joseph tripped on something just prior to his fall is hotly contested by the parties. Defendants point to the following testimony from Joseph's deposition for their position that Joseph lost his balance or took a misstep:

> A. . . . And [the floored area] was a flat floor. It wasn't like you had to step on this board and watch that board. It wasn't nothing like that. It was just like a floor like here in your living room. Okay? But—
> Q. There is no carpet or anything?
> A. There is no carpet.
>
>         \*                \*                \*
>
> Q. Okay. So, tell me, as best you can remember, how did you—how did you—what happened from the time you started picking up that box, or whatever it was, and then you find yourself in the ceiling?
> A. Right.

4

Q. Okay. Tell me about that.
A. Okay. The only thing that I can remember is that when I went to pick up that box, seemed like I got off balance and just went over.

                \*                \*                \*

Q. . . . When you went to pick it up, was it necessary – did you have any reason to have to go around and go off the floor and stand on the joist to pick it up?
A. No. I didn't go around off the floor.
Q. And there was no need to do that?
A. No.
Q. Okay. No, there was no need?
A. No, there was no need.
Q. Okay. Now, the floor itself, did it give way underneath you?
A. (No response).
Q. Not the part you fell into, but the part you were standing on, did it give way?
A. I don't remember nothing like that.

                \*                \*                \*

Q. Okay, Mr. Joseph, as I understand it, you had successfully removed everything out of the attic, except the last one or two cartons?
A. Right.
Q. Is that fair to say?
A. Yes.
Q. All right. So you were standing upright and you were moving around in the room without any problems, up until you had your fall?
A. Right.
Q. Is that correct?
A. Right.
Q. Okay. You didn't trip on anything?
A. (Shaking head from side to side) No.
Q. Okay. There was no problem with the flooring?
A. Nothing that I can remember. The only problem was with the flooring is when I went over.

(Joseph Depo. at 107-08, 112-113, 124-125, 168-169). For his part, Joseph points to his affidavit in which he states:

1. The floored portion of the attic of the Emmons' home was floored with boards.

5

> 2. The flooring was not secure.
> 3. The unsecured flooring caused me to become off-balanced while bending to pick up a package.
> 4. It seemed like I was on a seesaw going down because of the unsecured flooring.
> 5. I ended up feet first through the ceiling.
> 6. I did not take a wrong step just prior to ending up feet first through the ceiling.

(Joseph Affidavit).

At all relevant times, Allied had in place a procedure relating to removal or placement of items in inaccessible locations. That procedure, which is identified as Item 58, provides:

> ITEM 58
> REMOVAL OR PLACEMENT OF PROPERTY
> FROM OR TO INACCESSIBLE LOCATIONS
> It is the responsibility of the shipper for removal or placement of property from or to attics, basements and other locations, and to make property available to the carrier where the location of property and goods to be shipped or delivered is (1) not accessible by a permanent stairway (does not include ladders of any type), (2) not adequately lighted, (3) does not have a flat continuous floor, and (4) does not allow a person to stand erect. If the shipper or owner requests and carrier agrees to removal or placement of property from or to such areas not readily accessible, Item 120, Labor Charges, will apply for this service.

(Pf. SOF ¶ 5). Joseph was not aware of this provision. (Docket Entry No. 71 at 12-13). Allied representatives have indicated that continuous flooring means flooring which is "actually nailed down" and which contains no gaps between the entrance and where the boxes to be moved are located. (Recker Depo. at 17-20; Bloomfield Depo. at 12-14).

6

When a driver has questions about removing items from what is thought to be an inaccessible location, the driver can call the booking agent for advice. (Pf. SOF ¶¶ 6, 9). However, the driver also bears some responsibility for determining if a move is safe. (Pf. SOF ¶ 11). There was no additional charge for moving items from Emmons' attic in this case. (Pf. SOF ¶ 18).

**II. STANDARD OF REVIEW OF SUMMARY JUDGMENT MOTIONS**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden

7

of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW RELATING TO SUMMARY JUDGMENT MOTIONS

As a preliminary matter, the Court must address the Defendants' argument that the Court should not consider the affidavit Joseph filed in response to the motions for summary judgment because that affidavit contradicts the sworn statements he gave in his deposition about the circumstances surrounding his fall. Based upon prevailing Sixth Circuit precedent, the Court agrees.

"[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." Penny v. United Parcel Service, 128 F.3d 408, 415 (6th Cir. 1997). This general principle was set forth in Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986) and just recently

revisited by the Sixth Circuit in <u>Aerel, S.R.I. v. PCC Airfoils, LLC</u>, 448 F.3d 899 (6th Cir. 2006) to take into account three unpublished opinions (<u>Lockard v. General Motors Corp.</u>, 52 F. Appx. 782, 788-89 (6th Cir. 2002), <u>Smith v. Consolidated Rail Corp.</u>, 1996 WL 366283, at *4 (6th Cir. 1996), and <u>Rosinski v. Electronic Data Systems Corp.</u>,1991 WL 105747, at *6 (6th Cir. 1991)) which appeared to have expanded <u>Reid</u>.

Because this case turns in great part upon the issue of what effect, if any, Joseph's affidavit should have on the issue of his fall in light of his prior deposition testimony, extensive reference to the analysis provided in <u>Aerel</u> is appropriate. In that case, the Sixth Circuit wrote:

> <u>Reid</u> and its progeny have thus barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony[.] This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage. Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, we see no reason to apply *Reid* and its progeny to such a situation[.]
>     *      *      *
>  Our conclusion is in accord with the variations of the *Reid* rule adopted by our sister circuits[.] These rules invariably reflect the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact.
>     *      *      *
>  As we interpret <u>Reid</u> and the other relevant authorities, then, a district court deciding the admissibility of a post-deposition affidavit at the

9

> summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony[.] If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue[.]'

Aerel, 448 F.3d at 907-908.

In this case there is a direct contradiction between Joseph's affidavit and his deposition testimony, not merely a gap which the affidavit seeks to fill. In his deposition, after being asked by counsel for the Allied Defendants to explain how he ended up in the ceiling, Joseph testified "The only thing that I can remember is that when I went to pick up the box, seemed like I got off balance and just went over." (Joseph Depo. at 113). When asked whether the floor on which he was standing gave way, Joseph testified "I don't remember nothing like that."[3] Later, under questioning by Emmons' counsel, Plaintiff stated he did not trip over anything and then when asked whether there was any problem with the flooring, Plaintiff testified "[n]othing that I can remember. The only problem with the flooring is when I went over." (Id. at 168-169).

In contrast to his deposition testimony that there was nothing wrong with the flooring, Joseph states in his affidavit that "the

---

[3]This statement, apart from contradicting his later-filed affidavit, contradicts his earlier responses to Interrogatory Number 5 which asked him to explain the circumstances surrounding his fall. In his response, Joseph indicated that "he bent down to pick up one of the items, and at the same time as he bent over the flooring gave away under him[.]" (Pf. Resp. Int. 5).

10

flooring was not secure" which caused him to become off-balance. (Joseph Aff. ¶¶ 2-3) Also in contrast to his deposition testimony that he "got off balance and just went over," Joseph states in his affidavit that he "did not take a wrong step just prior to ending up feet first through the ceiling." (Id. ¶ 6). It is difficult to conceive of more directly contrasting statements of how the accident occurred.

Aerel teaches that unless the non-movant provides "a persuasive justification," Aerel, 448 F.3d at 908, for the contradiction between an affidavit and earlier sworn testimony (something which is not even attempted in this case), a court should strike or disregard the affidavit. It also teaches that even if an affidavit is not directly contradictory it may be disregarded if the court determines that it "'constitutes an attempt to create a sham fact issue.'" Id. (citation omitted). In making this determination, the court should consider such things as "'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.'" Id. (citation omitted).

Here, the middle two factors favor a finding that Joseph is attempting to create a sham issue because the circumstances

11

surrounding his fall were well-known to him (indeed only to him since there were no witnesses) at the time of his deposition. While Joseph was not cross-examined at his deposition, this may be because his testimony regarding his fall did not reflect any confusion as to the questions asked. He was provided the opportunity (on at least three occasions) to explain in his own words the circumstances surrounding his fall and he testified that there was nothing wrong with the flooring and that he basically just lost his balance. Given his deposition testimony, the Court finds that Joseph is trying to create a sham issue by way of his affidavit because without his affidavit he cannot prevail on his negligence claim. Because Joseph's affidavit presents a version of the facts not supported by his deposition testimony and appears to have been submitted to avoid entry of summary judgment, it will not be considered by the Court in ruling on the Motions for Summary Judgment.

Having resolved this preliminary but significant procedural issue, the Court now turns to the substance of Joseph's negligence claim. In order to be liable for negligence under Tennessee law, a plaintiff must prove: (1) a duty of care owed by defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury; (4) causation in fact; and (5) proximate or legal cause. <u>Colin v. City of Savannah</u>, 966 S.W.2d 34, 39 (Tenn. 1998). "Recovery in a

12

negligence action may occur only if the plaintiff can prove that the defendants' conduct was negligent and was the proximate cause of plaintiff's injury." Kellner v. Budget Car and Truck Rental, Inc., 359 F.3d 399, 403 (6th Cir. 2004)(applying Tennessee law). Because Joseph cannot establish either that the Defendants were negligent or that their negligence was the proximate cause of his injuries, he cannot recover and hence Defendants are entitled to summary judgment.

Joseph has not established a breach of duty on behalf of any of the Defendants. "In the law of negligence, duty is simply a legal obligation owed by a defendant to conform to a reasonable person standard of care for the protection of the plaintiff against unreasonable risks of harm." Potts v. Nashville Elec. Serv., 2006 WL 468727 at *4 (Tenn. Ct. App. 2006). The existence or nonexistence of a duty owed to the plaintiff by the defendants is a question of law for the court. Marr v. Montgomery Elevator Co., 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995).

Turning first to the claims of negligence against Emmons, Tennessee has established a body of law setting forth the standard of care required of a homeowner in relation to independent contractors. "It is well-established an owner generally owes an independent contractor hired to perform work on the premises a duty to provide a reasonably safe place in which to work." Crain v. Baptist Memorial Hosp., 2005 WL 1996635 *4 (Tenn. Ct. App.

13

2005)(collecting cases). Hence, where the owner is aware of latent or potential dangers on the premises, the owner is under a duty to warn or offer protection against the danger. <u>Walker v. Robershaw Controls</u>, 1988 WL 125820 *2 (Tenn. Ct. App. 1988). "Although Tennessee law provides that premises owners owe invitees the duty to warn of latent or hidden dangers, this duty does not arise if the danger is open and obvious." <u>Eaton v. McClain</u>, 891 F.2d 587, 595 (Tenn. 1994).

In this case, the evidence shows that Emmons provided a reasonably safe place to work, including the attic area of his home. The attic was accessible by way of a standard staircase, entry was made through a standard doorway, and the attic was sufficiently lit. While the floor was not entirely floored, the floored portion was flat and secure and that which was not covered by wood presented a possible danger which was open and obvious since the joists and insulation could be easily seen.

As for the duty on behalf of the Allied Defendants, Plaintiff cites two inapposite cases dealing with an employer's duty with regard to an independent contractor's negligence to *third* parties, and a case dealing with the duties of a landowner, which, as this Court has already found, was not breached in this case. Additionally, Plaintiff argues that the Allied Defendants assumed a duty by virtue of Allied's procedure (Item 58) relating to inaccessible locations.

14

"One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." Marr, 922 S.W.2d at 529. As with the question of whether a duty exists, the question of whether one has assumed a duty is also a question of law. Stewart v. State, 33 S.W.2d 785, 793 (Tenn. 2000).

Plaintiff's assertion that the Allied Defendants assumed a duty is problematic for several reasons. First, Item 58 does not bar movers from entering an inaccessible place -- it only indicates that a surcharge will be levied for removing items from such places. Second, because Plaintiff was unaware of Item 58, he is in no position to identify what is meant by "continuous flooring," and the evidence provided by the Defendants is that continuous flooring did not require that a floor extend from wall-to-wall, only that the floored portion (1) contain no gaps from the entry to where the items were stored; and (2) not be loose. Third, even though Joseph was told to retrieve the items in the attic, he admits that he too was responsible for assuring the area was safe and, moreover, that he decided to remove the items from the attic to "make peace with everybody[.]" (Joseph Depo. at 105). Fourth, even if Item 58 could be deemed some sort of policy generally recognized in the industry, Plaintiff has produced no evidence which would suggest that allowing a mover to enter a room which contains items to be moved which sit on secure and flat flooring "poses an unreasonable and foreseeable risk of harm to persons or property." McCall v.

15

Wilder, 913 S.W.2d 150, 153 (Tenn. 1995). This is a key failure since Defendants' duty is only to protect a plaintiff against an "unreasonable risk[] of harm," Potts, 2006 WL 468727, at * 4, not all harm.

Even if Joseph could establish a duty owed by Emmons and the Allied Defendants, his claim fails because he cannot show a breach of the duty or proximate causation. While the questions of "whether the defendant breached its duty and whether the breach proximately caused the injury are generally questions decided by the trier of facts, Kelley v. Johnson, 796 S.W.2d 155, 157 (Tenn. 1990), "[t]hese questions become questions of law . . . when the facts and inferences drawn from the facts permit reasonable persons to reach only one conclusion." Id.

In this case, Joseph's deposition testimony indicates that the floor in the attic was flat and contiguous,[4] the floor did not give way beneath him, there was nothing wrong with the flooring, and he did not have to go around and off the board to pick up the item in question. (Joseph Depo. at 108-108, 112-113, 124-125, 168-169). Joseph testified that he did not trip on anything. (Joseph Depo. at 169). Instead, he "got off balance and just went over." (Joseph Depo. at 113). This testimony with the inferences derived therefrom construed in Joseph's favor support only one conclusion.

---

[4]Joseph testified "[i]t wasn't like you had to step on this board and watch that board." (Joseph Depo. at 107).

16

His fall was the result of an unfortunate accident. However, "Tennessee courts have repeatedly stated that negligence is not presumed from the mere fact of an accident or injury." Kellner, supra, 359 F.3d at 403 (collecting cases). Since Joseph has shown no more than an accident occurred, the Defendants are entitled to summary judgment.

### IV. CONCLUSION

On the basis of the foregoing, the Defendants' Motions for Summary Judgment will be granted but their requests for a hearing on those motions will be denied. An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE